## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## OWENSBORO DIVISION
## CIVIL ACTION NO. 4:05CV-00151-ERG

**MICHAEL WELSH**                                                              **PLAINTIFF**

**VS.**

**GRAYSON COUNTY DETENTION**
**CENTER, ET AL.**                                                           **DEFENDANTS**

### MEMORANDUM OPINION

### BACKGROUND

Before the Court is a motion for summary judgment filed by the Defendants, Grayson County Detention Center; Grayson County Fiscal Court; Joey Stanton, Individually and In His Official Capacity; and Sherry VanMeter, Individually and In Her Official Capacity (DN 34). Plaintiff has filed a memorandum in response (DN 37) and Defendants have filed a reply memorandum (DN 38).

This dispositive motion is ripe for determination. After careful consideration, the Court concludes that the motion for summary judgment should be granted in part and denied in part.

### STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate if "the pleadings depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The inquiry under Rule 56(c) is

"whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986); see also Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment...against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial..." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The party seeking summary judgment bears the initial burden of informing the Court of the basis of its motion and demonstrating the absence of any genuine issue of material fact. Celotex, 477 U.S. at 322-323. Once the moving party satisfies this burden, the burden shifts to the non-moving party to demonstrate there is a genuine issue of fact for trial. Anderson, 477 U.S. at 247-248. Although the Court must review the evidence in a light most favorable to the non-moving party, the non-moving party is required to do more than simply show that there is some "metaphysical doubt as to the material facts." Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rule 56 requires the non-moving party to present "*specific facts* showing there is a *genuine* issue for trial," by affidavit, depositions, answers to interrogatories, and/or admissions on file. Fed.R.Civ.P. 56(c) and (e) (emphasis added); Celotex, 477 U.S. at 324. The substantive law governing the case will determine what issues of fact are material. Street, 886 F.2d at 1479-1480. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, the motion for summary judgment should be granted." Pitts v. Michael Miller Car Rental, 942 F.2d 1067, 1069-1070 (6th Cir. 1991) (citing Matsushita Elec. Ind. Co., 475 U.S. at 586).

STATEMENT OF THE FACTS

Welsh was brought to the Grayson County Detention Center ("Detention Center") as a pretrial detainee on May 22, 2004. He was facing charges of Theft by Failure To Make Required Disposition of Property Over $300.00 and Flagrant Non-Support (DN 34, Exhibit A). Welsh remained at the Detention Center in the months that followed. On August 10, 2004, he was convicted of Criminal Possession of a Forged Instrument, Third Degree, in the Grayson District Court (DN 42, Welsh Deposition at Page 25). On November 9, 2004, he was convicted of Theft by Failure to Make Required Disposition of Property Over $300.00 and Flagrant Non-Support in the Grayson Circuit Court (DN 42, Welsh Deposition at 25-26).

Welsh's deposition testimony indicates on Sunday, October 10, 2004, he and an inmate nicknamed "Big Boy" were assigned to Dormitory 231 in the Brown Pod of the Detention Center (DN 42, Welsh Deposition at Pages 53-54, 65, 86, 97, 121 and Exhibit 2). Welsh subsequently learned Big Boy's real name is Richard Keesee ("Keesee").

In Dormitory 231 the bunk beds and sleeping mats were located against the walls of the day or living area (DN 42, Welsh Deposition at Pages 54, 56, and Exhibit 3). Welsh's diagram of Dorm 231, identifies the location of the bunk beds, sleeping mats, tables with chairs, the television mounted high up on the wall, and the bathroom (DN 42, Welsh Deposition at Page 66 and Exhibit 3). It also identifies (1) the location of Welsh's sleeping mat with the initials "MW"; (2) the table on which Big Boy was sitting prior to the attack with the initials "BB" circled; (3) the path Welsh took from his sleeping mat to the bathroom with a dotted line; (4) the location of the initial attack by Big Boy with a circled "X"; and (5) the location of the second attack, where Big Boy

3

stabbed him in the left eye, with a circled "XX" (DN 42, Welsh Deposition at Pages 66-73 and Exhibit 3).

Both attacks by Big Boy occurred around 11:00 p.m. on Sunday, October 10, 2004 (DN 42, Welsh Deposition at Pages 55, 95-97).  With the exception of Big Boy, all of the inmates in Dorm 231, including Welsh, were in bed trying to go to sleep or were asleep (DN 42, Welsh Deposition at Page 55).  Big Boy was sitting on the table closest to the wall-mounted television, watching a football game (DN 42, Welsh Deposition at Page 56).  Welsh recalls that Dallas played in an earlier game that Sunday but does not recall who was playing around 11:00 p.m. (DN 42, Welsh Deposition at Pages 55, 59,120-121).  Big Boy was betting on one of the teams and as that team started to lose he became upset and he began screaming obscenities (DN 42, Welsh Deposition at Pages 56-60).

The rest of the inmates in the dormitory cell, including Welsh,  asked Big Boy to calm down and to keep it down (DN 42, Welsh Deposition at Page 56-62).  Big Boy responded by telling everyone to shut up (DN 42, Welsh Deposition at 62).  Big Boy also complained about inmates not liking him in all of his previously assigned cells (DN 42, Welsh Deposition at 62).

Welsh got up from his sleeping mat and turned off the television as he walked by on his way to the bathroom (DN 42, Welsh Deposition at Page 67).  Big Boy, upset with what Welsh had just done, jumped off the table and hit Welsh in the back of the head (DN 42, Welsh Deposition at Pages 68-71).  As they were swinging at each other, inmates in the dorm gave out a warning about a guard at the dorm door (DN 42, Welsh Deposition at Pages 68-72).  Once Big Boy and Welsh separated, Welsh continued on to the bathroom (DN 42, Welsh Deposition at Pages 68-71).

As Welsh walked out of the bathroom, on his way back to his sleeping mat, Big Boy

4

stepped out from the wall, underneath the television, and struck Welsh in the eye with something in his left hand (DN 42, Welsh Deposition at Pages 68-73, 126).  Welsh experienced a sharp pain in his left eye (DN 42, Welsh Deposition at 73).  They wrestled around on the floor briefly and then separated because the guards were coming to do a headcount (DN 42, Welsh Deposition at 73).

       During the headcount, Welsh informed a deputy named Cletus Braga that he had sustained an eye injury (DN 42, Welsh Deposition at Pages 74-75).  Specifically, Welsh told Deputy Braga that he had rolled over in bed and the metal eraser holder (absent the eraser) on a pencil struck him in his left eye (DN 42, Welsh Deposition at Pages 74-75, 82-83).  Welsh did not tell Deputy Braga the truth about his eye injury because he was afraid of being labeled a snitch (DN 42, Welsh Deposition at Pages 81-82).  Welsh explained that snitches get picked on and beaten (DN 42, Welsh Deposition at Page 82).  Deputy Braga looked at Welsh's eye and then asked the medical deputy, Sherry VanMeter, to come take a look (DN 42, Welsh Deposition at Page 75).

       Welsh recalls Medical Deputy VanMeter took him to medical, looked at his eye, rinsed it out, and then indicated she thought it was just a scratch (DN 42, Welsh Deposition at Pages 75, 85 and Exhibit 7).  He recalls Medical Deputy VanMeter indicating she would leave a note asking Nurse Davis to take a look at his eye in the morning (DN 42, Welsh Deposition at Pages 75, 85 and Exhibit 7).  Welsh recalls Medical Deputy VanMeter put a patch on his eye, gave him a couple of Tylenols or Ibuprofens for pain, and sent him back to the dorm (DN 42, Welsh Deposition at 75, 85 and Exhibit 7).  Welsh testified that out of fear of being labeled a snitch he did not tell Medical Deputy VanMeter the truth about how the eye injury occurred (DN 42, Welsh Deposition at Page 75).  Instead, he told her that he poked his eye with a pencil when he rolled over in bed (DN 42, Welsh Deposition at Page 85 and Exhibit 7).  Welsh believes Medical Deputy VanMeter's

incident report mistakenly indicates he was housed in Cell 233 (DN 42, Welsh Deposition at Pages 84, 86, 121 and Exhibit 7).[1]

Welsh thinks he did see Medical Deputy Lynn Kirk the following night and she re-bandaged his eye (DN 42, Welsh Deposition at Page 87 and Exhibit 8).  Deputy Kirk's report indicates she saw Welsh on the night of October 12, 2004 (DN 42, Exhibit 8).  Welsh does not recall telling Medical Deputy Kirk that he stuck his eye with a pencil lead when he rolled over on his mat (DN 42, Welsh Deposition at Pages 87-88 and Exhibit 8).  Welsh did tell Medical Deputy Kirk that he failed to see the nurse because he slept all day (DN 42, Welsh Deposition at Page 88 and Exhibit 8).  Welsh recalled Medical Deputy Kirk did indicate he would be seen by the nurse the next morning (DN 42, Welsh Deposition at Page 89 and Exhibit 8).

Welsh does recall complaining to medical personnel about an itchy grainy feeling in his eyes (DN 42, Welsh Deposition at Pages 89, 90, 92 and Exhibit 9).  He recalled being told by a nurse that he had pink eye and being treated with Cortisporin drops and a patch (DN 42, Welsh Deposition at Pages 89-90, 92, 127).  He believes he was diagnosed with pink eye almost a week before Big Boy stabbed him in the left eye (DN 42, Welsh Deposition at Pages 89-90, 127 Exhibit 9).

Welsh was shown a document labeled "Physicians Telephone Orders," dated the 10th or 11th of October[2] (DN 42, Welsh Deposition at Pages 91-92 and Exhibit 10).  He does not recall

---

[1]Notably, Medical Deputy VanMeter's incident report is dated October 10, 2004. However, during her deposition Medical Deputy VanMeter testified because she started her shift at 12:00 a.m. she may have put the wrong date, it may have been the morning of Monday, October 11, 2004 when she saw Welsh (DN 26, VanMeter Deposition at Pages 34-36, Exhibit 5).

[2]The second digit of the number designating the day of the month looks like a "0" with a vertical line drawn through it (DN 42, Exhibit 10).  Defense counsel believed the date to be the

Nurse Tomes administering a Bleth eye treatment on either date (DN 42, Welsh Deposition at Page 91-92 and Exhibit 10).

Next, Welsh was shown the handwritten notes of Nurse Alvey, dated October 13, 2004 (DN 42, Welsh Deposition at Page 93 and Exhibit 11).  He confirms that he complained to her about eye pain (DN 42, Welsh Deposition at Page 94 and Exhibit 11).  While he does not recall what he told Nurse Alvey, he did not tell her the injury occurred the "night before last" (DN 42, Welsh Deposition at Page 94 and Exhibit 11).  He also denies that she tried to wash his eyes out (DN 42, Welsh Deposition at Page 94 and Exhibit 11).

Welsh recalls Deputy Jailer Trent Pierce took him to Leitchfield Eye Care on the morning of October 13, 2004 (DN 42, Welsh Deposition at Page 95 and Exhibits 11, 12).  Contrary to what is set forth in Pierce's incident  report, Welsh did not tell the doctor the injury occurred the day before (DN 42, Welsh Deposition at Pages 95-97 and Exhibit 12).  Welsh points out his injury happened on Sunday and the doctor examined him on Wednesday (DN 42, Welsh Deposition at Pages 95-97 and Exhibit 12).

Welsh confirmed that he underwent surgery in Louisville on the afternoon of Wednesday, October 13, 2004 (DN 42, Welsh Deposition at Pages 97-99 and Exhibits 13, 14).  He advised the doctors his injury occurred three nights earlier and they originally wrote that in the upper right corner of the document (DN 42, Welsh Deposition at Pages 99-101 and Exhibit 14).  However, when Deputy Jailer Pierce indicated it could have happened a week ago the doctors crossed out the original notation and wrote "1 wk" (DN 42, Welsh Deposition at Pages 100-101 and Exhibit 14).

_____

10th of October (DN 42, Welsh Deposition at Page 91).  After looking at the document Welsh asked whether it was the 10th or the 11th written on the document (DN 42, Welsh Deposition at Page 92 and Exhibit 10).

7

Welsh thinks the October 20, 2004 letter prepared by the eye surgeon, Catherine Newton, sets forth what he told her about how the eye injury occurred (DN 42, Welsh Deposition at Pages 101-103 and Exhibit 15). This letter from Dr. Newton indicates she performed an initial surgery on Wednesday, October 13, 2004 and a second surgery on Monday, October 18, 2004 (DN 15). Welsh confirmed that an associate with Dr. Arterbery performed the procedure that replaced his left eye with a prosthetic device (DN 42, Welsh Deposition at Pages 103-105 and Exhibit 17).

Welsh confirmed that on October 25, 2004, while being transported from the Detention Center to the doctor's office, he confided to his fourth cousin, Deputy Jason Clemons, that Big Boy caused his eye injury (DN 42, Welsh Deposition at Pages 105-108 and Exhibit 18). This was the first time he told anyone that Big Boy stabbed him in the eye (DN 42, Welsh Deposition at Page 108).

Sherry VanMeter ("VanMeter") testified that she worked as a third shift medical deputy from October 2002 through October 2004 (DN 26, VanMeter Deposition at Pages 7-8). Prior to being hired, Medical Deputy VanMeter was certified in basic first aid 1 and 2 as well as CPR (DN 26, VanMeter Deposition at Pages 11-13, 18-21, 22). When an inmate presents with an injury that in her opinion requires emergency medical care, she is supposed to render aid and call the shift supervisor (DN 26, VanMeter Deposition at Pages 26-29). The shift supervisor calls whoever needs to be called (i.e., nurse, ambulance) to address the medical problem (DN 26, VanMeter Deposition at Pages 26-29).

At approximately 6:30 a.m. on Monday October 11, 2004, Medical Deputy VanMeter

8

was making her early morning rounds distributing medication[3] (DN 26, VanMeter Deposition at Pages 30-37).   She found Welsh standing at the door of Cell 233 in the Brown Pod (DN 26, VanMeter Deposition at Pages 30-37).   He complained of poking his eye with a pencil as he rolled over in bed (DN 26, Deposition of VanMeter at Pages 30-37).   Welsh's eye was swollen, a little bit red, and watering (DN 26,VanMeter Deposition at Pages 30-37).   He asked her for Ibuprofen because his eye hurt (DN 26, VanMeter Deposition at Pages 30-37).

Medical Deputy VanMeter took Welsh to medical and rinsed his eye out to make sure the lead was out of his eye (DN 26, VanMeter Deposition at Pages 31-37).   She provided him with Ibuprofen, escorted him back to the cell, and told him if he had any problems let her know and she would call the nurse (DN 26, VanMeter Deposition at Pages 31-37).   Medical Deputy VanMeter did not feel Welsh was in need of emergency medical care when she first saw him on Monday morning, October 11th (DN 26, VanMeter Deposition at Page 48).

Medical Deputy VanMeter wrote up a report summarizing what occurred (DN 26, VanMeter Deposition at Page 33, Exhibit 5).   With the exception of the date on her report, Medical Deputy VanMeter believes her report truly and accurately sets forth what occurred that morning (DN 26, VanMeter Deposition at Pages 34-37).

Medical Deputy VanMeter testified that the nurse would have come on duty at 8:00 a.m. that Monday morning (DN 26, VanMeter Deposition at Pages 35-37).   She does not recall seeing the nurse before  completing her shift and leaving the Detention Center (DN 36, VanMeter

---

[3]Medical Deputy VanMeter testified although her report indicates she saw Welsh on the 10th, she believes she may have put the wrong date because she starts work at 12:00 a.m. (DN 26, VanMeter Deposition at Page 36).   Medical Deputy VanMeter believes she may have seen Welsh on Monday October 11th at 6:30 a.m. (DN 26, VanMeter Deposition at Pages 36-37).

Deposition at Pages 37-38).

Medical Deputy VanMeter does recall bringing Welsh back to medical after the first shift medical deputy, Carol Kopp, arrived at 8:00 a.m. (DN 26, VanMeter Deposition at Pages 38-41). Medical Deputy VanMeter recalls they both looked at Welsh's eye and that Kopp indicated she would advise the nurse about his eye when the nurse arrived (DN 26, VanMeter Deposition at Page 38-41). Medical Deputy VanMeter recalls Welsh being in some distress and that Kopp gave him two more Ibuprofen before sending him back to the cell (DN 26, VanMeter Deposition at Pages 40-41). She does not recall Welsh asking for any further medical treatment (DN 26, VanMeter Deposition at Pages 40-41). Nor does Medical Deputy VanMeter know whether Kopp told Nurse Davis about Welsh (DN 26, VanMeter Deposition at Pages 41-42).

When Medical Deputy VanMeter  returned to work at 12:00 a.m. on October 12th, Welsh was in the medical observation cell (DN 26, VanMeter Deposition at Pages 42-44). She recalls being told that Welsh had been to the doctor and was prescribed eye drops (DN 26, VanMeter Deposition at Pages 44-45). She did not believe Welsh was in need of emergency medical care when she started her shift at 12:00 a.m. on October 12th (DN 26, VanMeter Deposition at Pages 48-50).

Anita Lynn Kirk was hired as a medical deputy at the Detention Center in 2002 (DN 28, Kirk Deposition at Page 8). She previously worked as an emergency room tech for twenty-five years, held an EMT certification, and earned a certified nursing assistant designation (DN 28, Kirk Deposition at Pages 9-11). Through the Detention Center she receives training in first aid, CPR, and AED (DN 28, Kirk Deposition at Pages 12-13).

On October 12, 2004, at approximately 7:15 p.m., Welsh called Kirk to his cell door

10

(DN 28, Kirk Deposition at Pages 15-17).  Welsh indicated that his eye was watering and requested a new eye patch (DN 28, Kirk Deposition at Pages 15-19).  Kirk returned a few minutes later and took Welsh to medical (DN 28, Kirk Deposition at Pages 17-19).  When she removed the old eye patch Welsh's eye looked kind of "swiveled" and watery but it was not red or bleeding (DN 28, Kirk Deposition at Page 18, 24).  Welsh did not complain about pain, just about his eye being watery (DN 28, Kirk Deposition at Pages 18-19).  Kirk put on another patch and told Welsh that she would leave an e-mail for the nurse to see him immediately the next morning (DN 28, Kirk Deposition at Pages 18-19).  Kirk prepared her incident report after she returned Welsh to his cell (DN 28, Kirk Deposition at Pages 15-17, Exhibit 1).  When Kirk asked Welsh why he had not seen the nurse that day he indicated he had slept most of the day (DN 28, Kirk Deposition at Pages 18-19).

Since February of 2003, Judy Alvey ("Alvey")  has worked as a registered nurse at the Detention Center (DN 30 at Pages 6-7, 18-21).  Alvey completed her registered nurse training in 1993 (DN 30 at Pages 15-16).  Following graduation in 1993, she worked for Twin Lakes Regional Medical Center (DN 30 at Pages 16-17).  Generally, Alvey considers the inmate's complaint, conducts an examination, and decides whether the inmate needs to be seen by the nurse-practitioner, a doctor or taken to the emergency room (DN 30 at Pages 20-22).  Alvey reports to the nurse-practitioner, Carol Byrd, who in turn reports to Dr. John Gover (DN 30 at Pages 22-23).  In October of 2004, there was also an LPN named Trinity Tomes (DN 30, Alvey Deposition at Page 24).  During the relevant time frame, Alvey worked from 8 a.m. to 4 p.m. Monday through Friday and was on call through the weekends (DN 30, Alvey Deposition at Page 25).

In October of 2004, the medical staff at the jail included Alvey, Tomes, and medical deputies with first aid training (DN 30, Alvey Deposition at Pages 28-30).  If an inmate sustained

11

an injury after regular nursing hours the medical deputy would be responsible for getting the inmate to the emergency room or contacting the nurse on call to determine how to proceed (DN 30, Alvey Deposition at Pages 31-32).

According to Exhibit 3, on October 5, 2004, the nurse practitioner prescribed Cortisporin to address Welsh's complaint of an itchy and grainy feeling in his eye (DN 30, Alvey Deposition at Pages 33-34).   Alvey points out Exhibit 3 does not indicate whether Welsh's symptoms were due to an injury (DN 30, Alvey Deposition at Page 33-34).   However, the eye drops prescribed on October 5th (Exhibit 3) are not used to treat a traumatic eye injury like the one she observed on October 13th (DN 30, Alvey Deposition at pages 73-75).

When Alvey arrived at the Detention Center on the morning of October 13, 2004, she reviewed an e-mail note from medical deputy Lynn Kirk that indicated Welsh's eye needed to be examined (DN 30, Alvey Deposition at Page 34).   She does not recall if the e-mail mentioned an eye injury (DN 30, Alvey Deposition at Pages 49-50).   Alvey confirms the notes at the top and bottom portions of Exhibit 1are in her handwriting (DN 30, Alvey Deposition at Pages 34-37).   She does not know who wrote the note in the middle of that page (DN 30, Alvey Deposition at Pages 35-36).   Alvey's notes regarding how the injury occurred are based on what Welsh told her (DN 30, Alvey Deposition at Pages 36-37).   Alvey does not know whether Welsh previously reported this injury to anyone in the medical department (DN 30, Alvey Deposition at Page 37).   Nor does she know whether she worked on Monday October 11th or Tuesday October 12th (DN 30, Alvey Deposition at Page 39).

At 9:15 a.m., on October 13th it was obvious to Alvey that Welsh's eye needed emergency care (DN 30, Alvey Deposition at Pages 40-41).   She did not question Welsh's story

about how the injury occurred or his failure to report the injury sooner, she focused on his need for immediate care (DN 30, Alvey Deposition at Pages 42-43, 59).  She recalls seeing an indentation in the middle of his eye, as though something went in but did not necessarily come out (DN 30, Alvey Deposition at Page 41).  She did not notice any bleeding in the eye, contusions around the eye or bruising (DN 30, Alvey Deposition at Pages 41-42).  Her notes indicate Welsh reported the injury occurred the night before last (DN 30, Alvey Deposition at Page 42).  Alvey did send out an e-mail at 9:45 a.m. (Exhibit 4) to find out whether Welsh previously reported the injury to the medical deputies and if he did why nothing was done sooner (DN 30, Alvey Deposition at Pages 46-47).

Alvey advised her immediate supervisor, Woosley, that Welsh sustained an eye injury and needed emergency medical treatment (DN 30, Alvey Deposition at Pages 68-70).  She provided this information to Woosley because he is her superior and wanted him to know in case there was something serious going on (DN 30, Alvey Deposition at Pages 69-70).

Alvey cannot determine whether the telephone order (Exhibit 8) is dated the 10th or 11th of October (DN 30, Alvey Deposition at Page 75, 80).  The telephone order indicates that Carol Byrd, the nurse practitioner, directed Tomes, the LPN, to administer in the left eye Bleth eye drops for ten days and to see Nurse Byrd on her next visit if the condition is not improving (DN 30, Alvey Deposition at Pages 76-79).

Alvey confirmed an accurate history of a medical condition is important in determining what course of medical treatment to take (DN 30, Alvey Deposition at Page 89).  Alvey cannot say that on the 13th of October it was obvious that some foreign object had gone into Welsh's eye (DN 30, Alvey Deposition at Page 90).  Alvey explained that it was obvious there was something terribly wrong with Welsh's eye (DN 30, Alvey Deposition at Page 90).  Alvey concedes

her notes indicate at the time she thought it was a foreign object but she points out that she had never seen anything like that before (DN 30, Alvey Deposition at Page 90).

Anthony Pierce is a Major at the Detention Center (DN 25, Pierce Deposition at Page 5). His duties include outside operations and the K-9 Unit (DN 25, Pierce Deposition at Page 5). Pierce has known Welsh for ten to fifteen years but they are not friends (DN 25, Pierce Deposition at Pages 7-8).

On October 13, 2004, Pierce transported Welsh to Leitchfield Eye Care, then to the hospital in Louisville, and then back to the Detention Center (DN 25, Pierce Deposition at Pages 9, 11, 13, 14). Initially, Welsh told Pierce that he had scratched his eye (DN 25, Pierce Deposition at Page 11). However, Pierce recalls the story changed after the eye doctor examined Welsh's eye and indicated there seemed to be a puncture wound (DN 25, Pierce Deposition at Pages 11-13). When the eye doctor advised Welsh that he needed to know exactly what happened, Welsh indicated a thrown pencil punctured his eye and he pulled it out by himself (DN 25, Pierce Deposition at Pages 11-13). The eye doctor then announced Welsh's eye needed emergency surgery and he did not know whether it could be saved (DN 25, Pierce Deposition at Pages 11-13). At this point Welsh became visibly worried and said he just thought it was a scratch (DN 25, Pierce Deposition at Page 13).

Pierce remained with Welsh while the emergency surgery was being performed at the Louisville hospital (DN 25, Pierce Deposition at Pages 4-16). Pierce prepared the incident report dated October 13, 2004, which is marked as Exhibit 1 (DN 25, Pierce Deposition at Page 17). The report is a true and accurate recitation of what occurred that day (DN 25, Pierce Deposition at Pages 18-19). Pierce believes Welsh told the eye doctor that the puncture injury happened the day before

14

(DN 25, Pierce Deposition at Pages 19-20).

On October 25, 2004, Jason Clemens transported Welsh to the eye doctor and back to the Detention Center (DN 27, Clemens' Deposition at Pages 10-14, Exhibit 1).  Clemens had known Welsh for years and did not believe his story about how the eye injury occurred (DN 27, Clemens' Deposition at Pages 10-14).  For this reason, Clemens encouraged Welsh to tell him what really happened (DN 27, Clemens' Deposition at Pages 10-14, Exhibit 1).

On their way back to the Detention Center, Welsh confided to Clemens that someone nicknamed "Big Boy" stabbed him in the eye (DN 27, Clemens' Deposition at Pages 10-14, Exhibit 1).  After they returned to the Detention Center, Clemens informed Mr. Woosley about what he learned from Welsh (DN 27, Clemens' Deposition at Pages 10-14, Exhibit 1).  Clemens was not familiar with a prisoner nicknamed "Big Boy" and Booking could not determine his identity based on the nickname (DN 27, Clemens' Deposition at Page 10-15).  Eventually, one of the trustees told Clemens that Keesee was nicknamed "Big Boy" (DN 27, Clemens' Deposition at Page 15).  Clemens failed to pass this information on to his superiors (DN 27, Clemens' Deposition at Page 16).

Joey Stanton ("Stanton")  was elected Grayson County Jailer in 1984 (DN 29, Stanton Deposition at Page 9).[4]  When the Detention Center opened in June of 2001 it had 366 beds but that number has since increased to at least 450 beds because the State living space standards have changed (DN 29, Stanton Deposition at Pages 13-14).  Stanton is not sure if the Detention Center had more than 366 beds in October of 2004 (DN 29, Stanton Deposition at Pages 16-17).

---

[4]He has a high school education with continuing education through the State Corrections Cabinet as well as Kentucky and national correctional organizations (DN 29 at Page 9).

15

The Detention Center is paid $47 a day to house a federal inmate[5] and $30.51 per day to house a State inmate (DN 29, Stanton Deposition at Pages 15-16).  Probably 65% of the inmates at the Detention Center are federal and State inmates (DN 29, Stanton Deposition at Page 16).  The majority of federal inmates at the Detention Center are pretrial or pre-sentencing detainees(DN 29, Stanton Deposition at Page 46-47).  However, there are some federal inmates who are serving out sentences for petty offenses[6] (DN 29, Stanton Deposition at Pages 46-47).

Stanton believes in 2004 the Detention Center had two registered nurses (DN 29, Stanton Deposition at Page 30).  The medical deputies are trained by the nurses to dispense medication and administer first aid (DN 29, Stanton Deposition at Pages 30-31).  However, all deputies are required to be trained in first aid and some have obtained EMT certification (DN 29, Stanton Deposition at Pages 31-32).

Stanton is not involved in determining inmate placement upon admission to the Detention Center (DN 29, Stanton Deposition at Pages 49-52).  To the best of their ability, they try to separate inmates who have a tendency to harm others[7] from other inmates (DN 29, Stanton Deposition at Pages 77-78, 80-85).  Pending charges is one of several factors considered when

---

[5]According to Stanton, the contract with the United States Marshal's Service specifies the amount that will be paid for housing each federal inmate (DN 29 at Page 48).  The contract does not, however, specify details like the number that will be housed or where they sleep (DN 29 at Pages 48-49).

[6]For example, a federal inmate who received a 30 day sentence for speeding at Mammoth Cave (DN 29, Stanton Deposition at Pages 46-47).

[7]He does not know if there are directions in the written policy and procedures manual which indicate a prisoner with a tendency to harm others should be segregated from other prisoners (DN 29, Stanton Deposition at Pages 77-78).

16

booking assesses an incoming inmate's propensity for violence[8] (DN 29, Stanton Deposition at Pages 40-41).  The Detention Center prisoner classification system focuses on the inmate's behavior at booking and any previous history they may have including charges (DN 29, Stanton Deposition at Pages 74-77).  While the Detention Center does not know what most of the federal inmates are charged with at the time of admission,[9] the United States Marshals do apprise the Detention Center of a federal inmate's special needs such as security (DN 29, Stanton Deposition at Pages 41-44).

Stanton believes the Detention Center complies to the best of its ability with State regulations for changing an inmate's classification following a disciplinary action (DN 29, Stanton Deposition at Pages 50-53).  Although Stanton testified he does not know how the reclassification process is done at the Detention Center he concedes that he is ultimately responsible for making sure inmates who pose a physical danger to other inmates are segregated from the other inmates (DN 29, Stanton Deposition at Pages 51-52).  Stanton indicated booking or the Colonel would be able to explain the reclassification process at the Detention Center (DN 29, Stanton Deposition at Page 51).

Stanton is not involved in determining where to place an inmate upon release from isolation (DN 29, Stanton Deposition at Pages 52-55).  He believes the determination is made on a case-by-case basis by the Chief Deputy or the Colonel (DN 29, Stanton Deposition at Pages 52-55).

There are a total of 15 cells available for isolation, including the 5 cells behind booking  (DN 29, Stanton Deposition at Page 56).  While in isolation an inmate does get rec

---

[8]He is sure the Detention Center's classification system takes into account the criminal or non-criminal status of the inmate (DN 29, Stanton Deposition at Pages 79-80). For example, is the inmate charged with a felony, a traffic violation, or non-support (DN 29, Stanton Deposition at Pages 79-80).

[9]Stanton conceded in a lot of cases the Detention Center does not know whether a federal prisoner is charged with a misdemeanor or a felony (DN 29, Stanton Deposition at Pages 78-79).

privileges but, depending on the circumstances, may or may not get recreation time with other inmates in isolation (DN 29, Stanton Deposition at Pages 57-58).  For example, inmates in isolation for fighting one another would not go to recreation together (DN 29, Stanton Deposition at Page 58).

Stanton does not remember being aware that Keesee underwent at least two disciplinary hearings and punishments prior to when Welsh's eye injury occurred (DN 29, Stanton Deposition at Pages 58-59).  Stanton reviewed Exhibits 14 and 21from the Woosley deposition which indicate Keesee received ten days isolation in October 2002 for profanity and repeating violations and 30 days isolation in July 2004 for assaulting another inmate (DN 29, Stanton Deposition at Pages 59-61).  Stanton does not remember being advised that Keesee broke the other inmate's arm during the assault (DN 29, Stanton Deposition at Pages 66-67).  Nor is there any indication of such an injury on the materials copied to Jailer Stanton (DN 29, Stanton Deposition at Pages 59-62; DN 31, Woosley Deposition Exhibits 14, 21, 22, 23, 24).

Stanton next reviewed copies of Exhibits 23 and 24 from the Woosley deposition which are copies of Keesee's notice of appeal and a denial of the appeal by the County Judge Executive (DN 29, Stanton Deposition at Pages 61-62).  Stanton concedes he would have received copies of these documents and they would have put him on notice that Keesee received 30 days isolation for assaulting another inmate (DN 29, Stanton Deposition at Pages 62-63).  Stanton acknowledged since he receives copies of incident reports when an inmate is placed in isolation, it would appear he was made aware of Keesee's placement in isolation on September 26, 2001, October 2, 2002, and July of 2004 (DN 29, Stanton Deposition at pages 69-71).

Stanton did not personally deal with Keesee's post-isolation housing placement because he relies on his Chief Deputy and Colonel to handle these situations (DN 29, Stanton

18

Deposition at Pages 63-68).  Stanton does not recall whether he asked his Chief Deputy or Colonel

for an update on Keesee's post-isolation behavior (DN 29, Stanton Deposition at Pages 68-69).

Jason Woosley ("Woosley") has a high school education with two semesters at

Western Kentucky University (DN 31, Woosley Deposition at Pages 8-9).  He began working at the

Detention Center in 2001 as a Deputy Jailer (DN 31, Woosley Deposition at Pages 9-10).  He was

promoted to the rank of Colonel in 2006  (DN 31, Woosley Deposition at Page 11).

In October of 2004, Woosley was a Major and Larry VanMeter was a Captain (DN

31, Woosley Deposition at Pages 14-15).  During that time frame Woosley oversaw operations for

first shift and would assist the Chief Deputy and the Colonel (DN 31, Woosley Deposition at Page

15).

Woosley knows Welsh because he has been an inmate at the Detention Center several

times (DN 31, Woosley Deposition at Pages 15-16).  In October of 2004, Welsh was a Grayson

County inmate brought in by the Sheriff's Office (DN 31, Woosley Deposition at Pages 20-21).  The

Inmate Classification Head Count sheet, dated September 30, 2004 (DN 34, Exhibit D), indicates

that Welsh was in Cell 233 or 234 (DN 31, Woosley Deposition at Pages 18-19).

Woosley has no personal knowledge regarding the cell Welsh was housed in on

October 10, 2004 (DN 31, Woosley Deposition at Pages 19-20).  While Cell 231 has twelve bunks,

Woosley does not know how many inmates were assigned to that cell on October 10, 2004 (DN 31,

Woosley Deposition at Pages 21-22).  When the number of inmates in a cell exceeds the number of

available bunks, mats are provided to the additional inmates so they can sleep on the floor (DN 31,

Woosley Deposition at Pages 24-25).  If there are available bunks, the federal inmates get first

priority, state inmates are next, and then county inmates (DN 31, Woosley Deposition at Pages

24-5).                    Woosley's testimony indicates the Detention Center uses a software program called Winsoms to keep records on the prisoners (DN 31, Woosley Deposition at Pages 134-135). The first page of the program is an inmate intake form that is filled out by the booking officer at the time of admission (DN 31, Woosley Deposition at Pages 134-135).  On a second page of the program the booking officer will make a notation regarding special needs and whether the inmate is classified as violent at the time of admission (DN 31, Woosley Deposition at Pages 37-42, 134-135).  If the inmate appears to be non-violent at the time of admission the booking officer does not make a notation on this second page (DN 31, Woosley Deposition at Pages 37-42).  If an inmate initially classified as non-violent subsequently exhibits violent behavior and is reclassified as violent then a notation will be made on the second page of the Winsoms software program (DN 31, Woosley Deposition at Pages 44-45).  Once the inmate is reclassified as violent on the second page of the computer program, each time jail personnel type the inmate's name into a Detention Center computer an alert note pops up on the computer screen warning that the inmate is classified as violent (DN 31, Woosley Deposition at Pages 37-42, 44, 71-73).

According to Woosley, the Detention Center has procedures in place to comply with Kentucky regulations regarding classification and separation of prisoners (DN 31, Woosley Deposition at Pages 54-57, Exhibits 3 and 6).  During the intake process booking personnel consider the pending charges (if known), available institutional behavioral history (if known), and the individual's intake behavior (DN 31, Woosley Deposition at Pages 56-57).  While pending charges is a factor in classifying an inmate as non-violent or violent, greater emphasis is placed on the inmate's behavior during booking and available institutional behavioral history (DN 31, Woosley Deposition at Pages 59-67).  According to Woosley, the Detention Center tries to house the most

20

violent inmates in the same cell, within a wing, to keep them from causing problems in cells that have non-violent inmates (DN 31, Woosley Deposition at Page 67).  Generally, a "violent" inmate is someone who wants to fight or likes to fight all the time (DN 31, Woosley Deposition at Page 68).

The Detention Center reclassifies inmates from non-violent to violent based upon a review of incident reports (DN 31, Woosley Deposition at Pages 70-71).  The number and type of incident reports in the inmate's file as well as the alert note that pops up on Detention Center computers provides Detention Center staff with notice regarding violent inmates (DN 31, Woosley Deposition at Pages 71-73).

If an inmate has a history of violence against another inmate they are no longer allowed to be together (DN 31, Woosley Deposition at Page 74).  If the inmate is so violent that he cannot be around anybody then that inmate is put in administrative segregation for an indefinite period of time (DN 31, Woosley Deposition at Pages 53-54, 74, Exhibit 3-Policy and Procedures Manual).  This is different from placing an inmate in isolation as a consequence or penalty for a major or serious offense (DN 31, Woosley Deposition at Pages 50-54, 75-76).

An inmate can receive up to 30 days isolation as penalty for a major or serious offense (DN 31, Woosley Deposition at Pages 50-4, 75-76).  Upon completion of an isolation term, the circumstances that led to imposition of the penalty are considered in deciding whether to return the inmate to regular population or place him in a special cell for violent inmates (DN 31, Woosley Deposition at Pages 75-76).  For example, a petty dispute over a television show that resulted in a thrown punch is treated differently from an attempt to kill another inmate (DN 31, Woosley Deposition at Pages 75-76).  According to Woosley, about 50% of violent incidents result in 30 days isolation (DN 31, Woosley Deposition at Pages 76-7).  Woosley indicated there are not that many

21

altercations at the Detention Center and when they do occur they are taken seriously (DN 31, Woosley Deposition at Page 77).

Woosley testified that the Detention Center picks up federal prisoners from the United States Marshal's offices in the Western and Eastern Districts of Kentucky, the Middle and Eastern Districts of Tennessee, the Southern District of Indiana, the Western District of West Virginia, and the Southern District of Ohio (DN 31, Woosley Deposition at Pages 136-137). The intake form for Keesee indicates he was admitted on July 13, 2001 (DN 31, Woosley Deposition at Page 27, Exhibit 1). Woosley cannot tell from looking at the intake sheet whether the booking officer made any notations about Keesee on the second page of the Winsoms program (DN 31, Woosley Deposition at Pages 28-29).

Woosley's testimony indicates at the time of admission, the Detention Center often times does not know the charges brought against federal inmates (DN 31, Woosley Deposition at Page 32). Woosley cannot say when the United States Marshal's Service provided the prisoner tracking form for Keesee, dated July 10, 2001 (DN 31, Woosley Deposition at Pages 32-35). Woosley concedes the charging information on the prisoner tracking form would be relevant to the intake classification assessment performed by booking (DN 31, Woosley Deposition at Pages 35-36).

After reviewing the Detention Center documents regarding Keesee, produced through discovery, Woosley testified that Keesee must have been classified as a non-violent inmate at the time of admission (DN 31, Woosley Deposition at Pages 37-42). Stated differently, since an alert note was not produced through discovery, Woosley concluded that Keesee was classified as a non-violent inmate when he was admitted to the Detention Center (DN 31, Woosley Deposition at

Pages 37-42).  Woosley has no personal knowledge regarding whether Keesee was ever subjected to disciplinary hearings and whether his inmate classification subsequently changed to violent (DN 31, Woosley Deposition at Page 44, 47-48).  If Keesee's inmate classification was changed from non-violent to violent as a result of any disciplinary hearings or actions that information would show up in an alert note on the Detention Center computers (DN 31, Woosley Deposition at Pages 44-45).  Notably, a colloquy between counsel reveals the Detention Center produced the complete inmate file for Keesee and it does not contain an alert note (DN 31, Woosley Deposition at Pages 44-45).

According to Woosley, in October of 2004, most of the federal inmates were housed in the Green Pod (DN 31, Woosley Deposition at Page 58).  Woosley does not know why Keesee, a federal inmate, was housed in the Brown Pod with Welsh (DN 31, Woosley Deposition at Pages 58-59).

Woosley reviewed the nine incident reports, records from two separate disciplinary hearings, and records concerning an appeal from a disciplinary hearing decision that are in the inmate file for Keesee (DN 31, Woosley Deposition at Pages 79-125, Exhibits 7-24).  The records cover the time frame September 7, 2001 through July 8, 2004 and discuss Keesee's arguments and altercations with other inmates, his use of profanity and disrespectful behavior toward deputy jailers, and refusal to comply with a Deputy Jailer's lawful orders (DN 31, Woosley Deposition at Pages 79-116, Exhibits 7-24).  The records indicate on October 2, 2002 Keesee received 10 days isolation and on July 8, 2004 he received 30 days of isolation (DN 31, Woosley Deposition at Pages 79-125, Exhibits 7-24).  After having his recollection refreshed by the above records, Woosley conceded he was aware that Keesee was a violent prisoner prior to July 2004 (DN 31, Woosley Deposition at Pages 100-101, 133).  He also conceded that Keesee "was pretty much considered a violent person after his first

23

couple of altercations" (DN 31, Woosley Deposition at Page 133).

Woosley has no personal knowledge regarding where Keesee was placed after his release from 30 days isolation in August 2004 (DN 31, Woosley Deposition at Pages 124-125). Keesee should have been assigned to a cell that had some violent offenders and would have remained in that cell unless he caused problems (DN 31, Woosley Deposition at Pages 125-128). Woosley is not sure that Keesee was in Cell 231 on October 10, 2004 (DN 31, Woosley Deposition at Pages 126-127).

Prior to October 10, 2004, Woosley was aware that Welsh had a history of altercations at the Detention Center and he would be considered to be "possibly violent" (DN 31, Woosley Deposition at Pages 136-139). Welsh's inmate file does contain a July 16, 2004 request to see the doctor because Welsh believed he broke his hand and nose in a fight with another inmate (DN 42, Welsh Deposition Exhibit 1; DN 31, Woosley Deposition at Pages 139-141). However, Woosley acknowledges nothing in Welsh's inmate file indicates he was ever cited or disciplined for violence against other inmates (DN 31, Woosley Deposition at Pages 139-142).

## DISCUSSION

### A

Kentucky's one-year statute of limitations set forth at KRS 413.140(1)(a) applies to Welsh's claims again the Defendants. Collard v. Kentucky Board of Nursing, 896 F.2d 179, 182 (6th Cir. 1990); Bell v. Cooper, 881 F.2d 257, 258 (6th Cir. 1989). Welsh filed his complaint on October 7, 2005 (DN 1). In relevant part, the complaint alleges Keesee stabbed Welsh in the eye on or about October 11, 2004 (DN 1, Paragraph 12).

Defendants argue that Welsh's claims are barred by the one-year statute of limitations because the evidence shows the assault occurred on September 27, 2004, not October 11, 2004 (DN 34, Memorandum at Pages 18-21).  In support of their arguments, Defendants cite the following evidence: (1) Welsh testified the Dallas Cowboys were playing a televised football game on the night the assault occurred; (2) the Dallas Cowboys played in a televised night game on Monday, September 27, 2004 (Exhibit H); (3) the Dallas Cowboys did not play any night games in October, 2004 (Exhibit H); (4) inmate headcount and cell check worksheets show Welsh and Keesee were housed together in dorm Cell 233 until September 30, 2004 (Exhibits D, E, and F); (5) Welsh testified he does not know the last day he and Keesee were housed together; and (6) on October 5, 2004, Nurse Alvey treated Welsh's eyes (DN 34, Memorandum at Pages 18-20).

Welsh argues his deposition testimony and Detention Center records prepared by Nurse Alvey and Medical Deputies VanMeter and Kirk are sufficient to demonstrate a genuine issue of fact for trial (DN 37, Memorandum at Pages 32-33).  Additionally, Welsh disputes the accuracy of the inmate cell assignment records submitted in support of Defendants' argument (DN 37, Memorandum at Page 33).

In their reply, Defendants reiterate their position regarding the evidence (DN 38, Memorandum at Pages 1-2).  Further, they contend Welsh's bare assertion regarding the accuracy of jail records is not sufficient to overcome their motion for summary judgment (DN 38, Memorandum at Page 3).

Welsh's deposition testimony does not provide factual support for Defendants' foundational premise - - the Dallas Cowboys were playing a televised football game at the time the assault allegedly occurred.  In toto, his deposition testimony indicates he recalls the Dallas Cowboys

25

played on Sunday October 10th but that game was over by the time the assault allegedly occurred and Welsh does not know who was playing in the televised football game around 11:00 p.m. when Keesee allegedly assaulted him (DN 42, Welsh Deposition at Pages 55, 59, 120-121).   Notably, Defendants' own evidence indicates the Dallas Cowboys played the New York Giants on Sunday, October 10th beginning at Noon central time (DN 34, Exhibit H).   Further, the Court notes that Baltimore played at Washington on Sunday, October 10, 2004, beginning at 7:30 p.m. central time. See 2004 NFL Regular Season Schedule at www.1800-sports.com.   Thus, Keesee may have been watching a televised football game on October 10th at the time Welsh alleges the assault occurred.

The inmate headcount and cell check worksheets submitted by Defendants do not demonstrate that Keesee and Welsh were housed together on September 27, 2004 (DN 34, Exhibits D, E, and F).   Rather, these exhibits merely show where Keesee and Welsh were housed together on September 30, 2004 and that Keesee was transferred to a different cell at some point on October 1, 2004 (DN 34, Exhibits D, E, and F).   If Defendants are trying to show that Keesee and Welsh were housed together on September 27, 2004, they need to provide the Court with the inmate headcount and cell check worksheets for that day, not three days later.   Nobably, Defendants have not provided inmate headcount and cell check worksheets showing where Welsh and Keesee were housed on October 10, 2004.   Thus, the Court is left with Welsh's unrebutted testimony that he and Keesee were housed in the same dorm cell on Sunday, October 10, 2004.

The reports prepared by Nurse Alvey and Medical Deputies VanMeter and Kirk, as well as their deposition testimony, provide relevant information regarding the question of when the assault occurred.   Additionally, the Court notes that during Welsh's deposition defense counsel did not ask him to identify the date and time the assault occurred.   As a result, Welsh has not explicitly

testified that the assault occurred in the waning hours of Sunday, October 10 or the early morning hours of Monday, October 11, 2004.   However, it can reasonably be inferred from Welsh's deposition testimony that he believes the assault occurred around 11:00 p.m. on Sunday, October 10, 2004 (DN 42, Welsh Deposition at Pages 55, 95-97, 121).   In sum, Defendants are not entitled to summary judgment on the issue of whether Welsh's claims are barred by the one-year statute of limitations because they have not satisfied their initial burden of demonstrating an absence of any genuine issue of material fact.   Further, Welsh has demonstrated there is a genuine issue of fact for trial.

B

The complaint asserts Constitutional claims against Jailer Stanton and Medical Deputy VanMeter in their individual capacities.   Defendants have moved for summary judgment on the issue of whether Jailer Stanton and Medical Deputy VanMeter are entitled to qualified immunity as a matter of law (DN 34, Memorandum at Pages 21-27).   The Court will discuss the applicable law before addressing the parties' arguments.

There appears to be no dispute that Jailer Stanton and Medical Deputy VanMeter are State actors for the purpose of 42 U.S.C. § 1983.   The doctrine of qualified immunity shields officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or Constitutional rights of which a reasonable person would have known.   Anderson v. Creighton, 483 U.S. 635 (1987); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Lunblad v. Celeste, 924 F.2d 627 (6th Cir. 1991).   Thus, the first step is to determine whether a Constitutional violation occurred.   Saucier v. Katz, 533 U.S. 194, 201 (2001);

27

Flint v. Kentucky Department of Corrections, 270 F.3d 340, 350, 352 (6th Cir. 2001) (citations omitted).  If so, the Court must determine whether the right was so clearly established that a reasonable person would have known that his or her actions violated that right.  Saucier, 533 U.S. at 201-202; Flint, 270 F.3d at 351.

1

The parties have not expressly addressed the issue of whether Welsh was a pretrial detainee or a prisoner serving a sentence at the time the assault allegedly occurred.  On August 10, 2004, Welsh was convicted of a crime in the Grayson District Court.  Additionally, on November 9, 2004, he was convicted of two crimes in the Grayson Circuit Court.  Thus, at the time of the alleged assault, Welsh may have been a prisoner serving a sentence on the Grayson District Court conviction or he may have been a pretrial detainee facing charges before the Grayson Circuit Court.

The parties have relied on Eighth Amendment law in making their arguments.  The Court could construe from their reliance on Eighth Amendment law that the parties view Welsh as a prisoner serving a sentence rather than a pretrial detainee.  However, the Court concludes a determination of Welsh's status at the time of the alleged assault is not critical to a proper adjudication of the issues raised on summary judgment.  The Eighth Amendment prohibition against cruel and unusual punishment applies to pretrial detainees through the Fourteenth Amendment's due process clause.  Bell v. Wolfish, 441 U.S. 520, 535 & n. 16 (1979); Weaver v. Shadoan, 340 F.3d 398, 410 (6th Cir. 2003).  Thus, regardless of whether Welsh was a pretrial detainee or a convicted prisoner serving a sentence, it is appropriate to analyze his claims under Eighth Amendment precedent.

28

The Eighth Amendment imposes a duty on officials to provide "humane conditions of confinement" which includes taking "'reasonable measures to guarantee the safety of the inmates...'" Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-527 (1984)).  Since Welsh alleges the harm was perpetrated by another inmate and his claims against Jailer Stanton and Medical Deputy VanMeter are based on their failure to prevent harm, his claim is characterized as one of conditions of confinement.  Farmer, 511 U.S. 832-834; Thaddeus-X v. Blatter, 175 F.3d 378, 400-401 (6th Cir. 1999).

An Eighth Amendment violation regarding conditions of confinement occurs when two requirements are met.  Farmer, 511 U.S. at 834.  "First, the deprivation alleged must be, objectively, 'sufficiently serious...'" Id.  For a failure to prevent harm claim, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." Id.  The second requirement "flows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" Id. (quoting Wilson v. Seiter, 501 U.S. 294, 297 (1991)).  This means the official must have a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834 (quoting Wilson, 501 U.S. at 302-303).  A sufficiently culpable state of mind in a conditions of confinement case is one of "'deliberate indifference' to inmate health or safety..." Farmer, 511 U.S. at 834 (quoting Wilson, 501 U.S. at 302-303) (other citations omitted).  This begs the questions what is "deliberate indifference," and should an objective or subjective test be used to determine whether "deliberate indifference" exists?

The Supreme Court in Farmer, indicated in an Eighth Amendment context, "deliberate indifference" exists if a prison official knows of and disregards an excessive risk to inmate health or safety.  511 U.S. at 837.  This means "the official must both be aware of facts from

which the inference could be drawn that a substantial risk of serious harm exists, and he must also

draw the inference."  Id.

Notably, in Farmer, the Supreme Court unequivocally adopted a subjective test for

"deliberate indifference."  511 U.S. at 835-847. It explained as follows:

> "[S]ubjective recklessness as used in the criminal law is a familiar
> and workable standard that is consistent with the Cruel and Unusual
> Punishments Clause as interpreted in our cases, and we adopt it as the
> test for 'deliberate indifference' under the Eighth Amendment."

Id. at 839-840.

The following excerpt from Farmer provides a helpful explanation why the Supreme

Court declined to adopt an objective test for "deliberate indifference":

> "The Eighth Amendment does not outlaw cruel and unusual
> 'conditions'; it outlaws cruel and unusual 'punishments.'  An act or
> omission unaccompanied by knowledge of a significant risk of harm
> might well be something society wishes to discourage, and if harm
> does result society might well wish to assure compensation.  The
> common law reflects such concerns when it imposes tort liability on
> a purely objective basis...**But an official's failure to alleviate a
> significant risk that he should have perceived but did not, while
> no cause for commendation, cannot under our cases be
> condemned as the infliction of punishment**."

Id. at 837-838 (emphasis added).

In sum, in order to find an Eighth Amendment violation on a failure to protect claim

the following requirements must be met: (1) The alleged deprivation must be objectively sufficiently

serious; and (2) the official must have been deliberately indifferent.  Farmer, 511 U.S. at 834.

2

The Court will now address Welsh's Constitutional claim against Jailer Stanton.  At

best, the evidence shows Jailer Stanton received copies of documents indicating the following: (1) Keesee was briefly placed in isolation on September 26, 2001 for being disrespectful and using profanity toward a deputy jailer[10]; (2) approximately one year later, on October 2, 2002, Keesee received 10 days isolation following a disciplinary hearing for his use of profanity toward staff and "repeating violations"; (3) approximately one year and nine months later, on July 8, 2004, Keesee received 30 days isolation following a disciplinary hearing for assault on another inmate; (4) Keesee appealed the 30 day isolation sentence because he claimed to have been attacked by the other inmate and used the mop handle in self defense; and (5) the County Judge Executive denied Keesee's appeal (DN 29, Stanton Deposition at Pages 62-63, 69-71; DN 31, Woosley Deposition Exhibits 8, 13-14, 21-24).

Welsh's reliance on the other incident reports regarding Keesee is misplaced because there is no indication on these incident reports that a copy was sent to Jailer Stanton.  Additionally, Colonel Woosley's testimony at best indicates he assumes Jailer Stanton was aware that Keesee was considered a violent inmate (DN 31, Woosley Deposition at Pages 133-134).  Finally, Woosley's deposition testimony indicates the inmate file for Keesee, produced through discovery, does not contain an alert note that would have shown up on the Detention Center computers.  The absence of an alert note indicates the Detention Center did not reclassify Keesee from a non-violent to a violent inmate as a result of these disciplinary hearings or actions in October 2002 and July 2004.

Even if the Court views all of the evidence in the record in a light most favorable to

---

[10]Nothing on this document indicates a copy was provided to Jailer Stanton.  However, Jailer Stanton's testimony indicates he may have received a copy of this document.  Viewing the evidence in a light most favorable to Welsh, the Court will assume Jailer Stanton did receive a copy of the document.

Welsh, at the time the assault allegedly occurred Keesee was considered a violent inmate by some members of the Detention Center staff and he posed some risk of harm to other inmates in the Detention Center. However, the evidence is not sufficient to show that he posed a substantial risk of serious harm to other inmates incarcerated at the Detention Center. Unquestionably there are a number of incident reports regarding Keesee's behavior in the three years preceding the fight with Welsh (DN 31, Woosley Deposition Exhibits 7-18). However, the incident reports indicate nearly fifteen months separate the July 7, 2004 fight from his last reported fight on April 19, 2003 (DN 31, Woosley Deposition Exhibits 16-17). Further, the incident reports in Keesee's inmate file identify only one injury to another inmate, the broken arm inmate Turner sustained during the July 7, 2004 fight (DN 31, Woosley Deposition Exhibits 7-17). While a broken arm is more than a minor injury, it alone is not sufficient to show that Keesee posed a substantial risk of serious harm to other inmates at the Detention Center. While Keesee did receive thirty days in isolation for assault on inmate Turner, there is no indication that criminal charges were ever brought against Keesee as a result of this assault. In sum, Welsh has not satisfied his burden as to the first requirement for demonstrating an Eighth Amendment violation.

The Court will now address the issue of deliberate indifference. Applying the subjective test for "deliberate indifference" to the evidence in the record, the Court concludes there is no evidence to substantiate a finding that Jailer Stanton knew of and disregarded an excessive risk to inmate safety. Farmer, 511 U.S. at 837. Stated differently, there simply is no evidence in the record indicating that Jailer Stanton was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and that he drew the inference. Id.

In sum, the Court concludes that Welsh has not demonstrated a genuine issue of fact

32

for trial regarding whether the alleged Eighth Amendment deprivation was sufficiently serious and that Jailer Stanton was deliberately indifferent.  Further, the Court concludes since a Constitutional violation did not occur, the doctrine of qualified immunity shields Jailer Stanton as to Welsh's failure to protect claim.

Notably, Welsh alternatively argues the evidence supports a federal supervisor liability claim against Jailer Stanton (DN 37, Memorandum at Pages 25-28).  However, Defendants point out in their reply memorandum that Welsh has not asserted a federal failure to supervise claim in his complaint (DN 38, Memorandum at Pages 4-7).  Further, Defendants argue the deadline for seeking leave to amend the complaint expired on August 1, 2006 (DN 38, Memorandum at Pages 4-5).  For these reasons, Defendants argue that Welsh's argument should be disregarded by the Court in addressing their motion for summary judgment (DN 38, Memorandum at Pages 4-5).  The Court agrees with Defendants.

3

Defendants argue that Medical Deputy VanMeter, in her individual capacity, is entitled to qualified immunity as a matter of law on Welsh's failure to protect claim (DN 34, Memorandum at Page 24).  Notably, Welsh has not responded to this argument (DN 37).  The Court construes Welsh's silence as a concession that summary judgment is appropriate as to this claim.  Therefore, the Court concludes Medical Deputy VanMeter, in her individual capacity, is entitled to qualified immunity as a matter of law on Welsh's failure to protect clam.

4

33

The Fourteenth Amendment's Due Process Clause does afford pretrial detainees a right to adequate medical treatment that is analogous to the Eighth Amendment right afforded prison inmates.  Weaver v. Shadoan, 340 F.3d 398, 410 (6th Cir. 2003).  Thus, regardless of whether Welsh was a pretrial detainee or a convicted prisoner serving a sentence, it is appropriate to analyze his medical care claims under Eighth Amendment precedent.  The "deliberate indifference" standard described above applies to Welsh's medical care claims against Jailer Stanton and Medical Deputy VanMeter.  Estelle v. Gamble, 429 U.S. 97, 105 (1976); Weaver, 340 F.3d at 410.

In relevant part the Supreme Court's opinion in Estelle reads:

> "We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,'...prescribed by the Eighth Amendment.  This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs...or by prison guards in intentionally denying or delaying access to medical care...or intentionally interfering with the treatment once prescribed...Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983."

429 U.S. at 104-105 (citation and footnotes omitted).  Notably, an inadvertent failure to provide adequate medical care does not rise to the level of deliberate indifference.  Id. at 105-106.  Thus, negligence in diagnosing or treating a medical condition does not state a valid claim under the Eighth Amendment.  Id. at 106.  Only acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs is a violation of the Eighth Amendment.  Id.   A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.  Blackmore v. Kalamazoo County, 390 F.3d 890, 897 (6th Cir.  2004) (citation omitted).

Viewing the evidence in a light most favorable to Welsh, he has not demonstrated

a genuine issue of fact for trial regarding whether Jailer Stanton violated his Eighth Amendment right.  There is no indication Jailer Stanton was aware that Welsh had a serious medical need during the relevant time frame.  Further, there is no indication Jailer Stanton was deliberately indifferent to Welsh's serious medical need.  Thus, the Court concludes Jailer Stanton, in his individual capacity, is entitled to qualified immunity as a matter of law on Welsh's medical care claim under the Eighth Amendment.

5

Viewing the evidence in a light most favorable to Welsh, the Court concludes he has failed to demonstrate a genuine issue of fact for trial regarding whether Medical Deputy VanMeter violated his Eighth Amendment right.  The evidence indicates at the time Medical Deputy VanMeter examined Welsh's eye the injury was not so obvious that even a lay person would easily recognize the necessity for a doctor's attention.  Unquestionably, a truthful description of how the eye injury occurred - - stabbed in the eye during a fight - - could have helped Medical Deputy VanMeter assess the seriousness of Welsh's medical need.  Further, there is no evidence in the record indicating Medical Deputy VanMeter intentionally denied or delayed access to medical care.  Thus, the record taken as a whole could not lead a rational trier of fact to find Medical Deputy VanMeter was deliberately indifferent to Welsh's serious medical need.  In sum, the Court concludes that Welsh has failed to demonstrate there is a genuine issue of fact for trial regarding whether Medical Deputy VanMeter was deliberately indifferent to a serious medical need.  Furthermore, Medical Deputy VanMeter, in her individual capacity, is entitled to qualified immunity as a matter of law on Welsh's medical care claim.

35

C

Defendants point out that Welsh has named the Grayson Fiscal Court, the Grayson County Detention Center, the Jailer in his official capacity and Medical Deputy VanMeter in her official capacity (DN 34, Memorandum at Page 27).  Defendants point out that the official capacity claims and the claims against the Grayson County Detention Center are merely another way of stating a claim against the Grayson County Fiscal Court (DN 34, Memorandum at Page 27).  Since these claims are duplicative, Defendants argue they must be dismissed as a matter of law and considered to be one and the same as the claims asserted against Grayson County Fiscal Court (DN 34, Memorandum at Page 27).

Notably, Welsh has not responded to this argument (DN 37).  The Court construes his silence as a concession that the claims against the Grayson County Detention Center, Jailer Stanton in his official capacity and Medical Deputy VanMeter in her official capacity must be dismissed as a matter of law and considered to be one and the same as the claims asserted against the Grayson County Fiscal Court.

D

Next, Defendants argue Welsh's federal Constitutional claims against the Grayson County Fiscal Court fail as a matter of law (DN 34, Memorandum at Pages 27-29).  Notably, Welsh has not responded to this argument in his memorandum (DN 37).  The Court construes his silence as a concession that his federal claims against the Grayson County Fiscal Court must be dismissed as a matter of law.

36

E

Next, Defendants argue that Welsh's State law negligence claims against the Grayson County Fiscal Court, the Grayson County Detention Center, Jailer Stanton in his official capacity, and Medical Deputy VanMeter in her official capacity must be dismissed based on the Doctrine of Sovereign Immunity (DN 34, Memorandum at Page 29). Notably, Welsh's memorandum does not respond to this argument[11] (DN 37). The Court construes Welsh's silence as a concession that his State law negligence claims against the Grayson County Fiscal Court, the Grayson County Detention Center, Jailer Stanton in his official capacity and Medical Deputy VanMeter in her official capacity must be dismissed based on the Doctrine of Sovereign Immunity.

F

Next, Defendants argue that Medical Deputy VanMeter is entitled to summary judgment as a matter of law on Welsh's negligence claim against Medical Deputy VanMeter, in her individual capacity (DN 34, Memorandum at Pages 29-31). Defendants argue that there is not even a "scintilla of evidence" that Medical Deputy VanMeter breached her duty of ordinary care in light of what she observed that night and the fact that Welsh lied about how he sustained the injury to his eye (DN 34, Memorandum at Pages 29-31). Defendants further point out that Welsh did not follow Medical Deputy VanMeter's advice to contact her if he had any more problems and contact the nurse for followup care (DN 34, Memorandum at Pages 30-31).

Welsh's memorandum does not directly respond to Defendants' argument (DN 37).

---

[11]Welsh's memorandum does address the issue of whether Jailer Stanton, in his individual capacity, is entitled to some type of immunity from the State law negligence claims (DN 37, Memorandum at Pages 28-31). That argument will be discussed below.

Instead, Welsh acknowledges that he has asserted various malpractice and/or failure to render proper medical treatment claims and submits these claims are supported by the evidence in the record (DN 37, Memorandum at Pages 33-34). This general assertion is not sufficient to demonstrate a genuine issue of fact for trial.

Noticeably absent is an expert opinion substantiating Welsh's malpractice and/or failure to render proper medical treatment claim(s) against Medical Deputy VanMeter. Nor is the evidence in the record sufficient to lead a rational trier of fact to find for Welsh on such a claim(s). Based upon the evidence in the record, the Court concludes Medical Deputy VanMeter is entitled to summary judgment on Welsh's State law malpractice and/or failure to render proper medical treatment claim(s) that are brought against Medical Deputy VanMeter in her individual capacity.

G

Next, Defendants argue that Jailer Stanton is entitled to summary judgment on Welsh's State law negligence claim, set forth at Paragraph 18 in the complaint, which alleges Jailer Stanton, in his individual capacity, failed to properly train, supervise and/or manage his medical staff on the proper care and treatment of prisoners (DN 34, Memorandum at Pages 31-35). Welsh has not directly responded to this argument (DN 37). Instead, Welsh acknowledges that he has asserted various malpractice and/or failure to render proper medical treatment claims and submits these claims are supported by the evidence in the record (DN 37, Memorandum at Pages 33-34). This general assertion is not sufficient to demonstrate a genuine issue of fact for trial. Based upon the evidence in the record, the Court concludes Jailer Stanton is entitled to summary judgment on Welsh's State law negligence claim, set forth at Paragraph 18 in the complaint, which alleges Jailer

Stanton, in his individual capacity, failed to properly train, supervise and/or manage his medical staff on the proper care and treatment of prisoners.


                                           H

        Finally, Defendant Stanton seeks summary judgment on Welsh's State law negligence claim against him, in his individual capacity, that arises out of the Keesee assault (DN 34, Memorandum at Pages 33-35). Jailer Stanton asserts since the Detention Center's prisoner classification system complies with the Kentucky Department of Corrections regulations and the evidence in the record indicates Keesee and Welsh were both violent prisoners there is no factual basis or legal authority to support Welsh's negligence claim (DN 34, Memorandum at Pages 33-34). Stanton also contends since Welsh initiated the altercation  there is no basis for alleging that Jailer Stanton breached a duty to Welsh (DN 34, Memorandum at Pages 33-34). Alternatively, Stanton argues since Welsh cannot demonstrate the existence of a "special relationship" between himself and Jailer Stanton there was no duty owed to Welsh and, thus, no actionable claim in negligence (DN 34, Memorandum at Pages 34-36).

        In his response, Welsh argues Kentucky common law imposes a duty on Jailer Stanton to exercise reasonable and ordinary care and diligence to prevent unlawful injury to a prisoner, such as Welsh, placed in his custody (DN 37, Memorandum at Page 30). See Hall v. Midwest Bottled Gas Distributors, Inc., 532 S.W.2d 449, 452 (Ky. 1975). Welsh relies on the holding in Hall to argue a "special relationship" did exist between Welsh and Jailer Stanton when

                                          39

the assault occurred (DN 37, Memorandum at Page 31).[12]  See Hall, 532 S.W.2d at 452.

In their reply memorandum, Stanton again argues since both inmates were considered violent and the Detention Center complied with the regulations for classifying and segregating violent prisoners there cannot be a breach of any purported duty of care and Welsh's negligence claim against Jailer Stanton, in his individual capacity, must fail as a matter of law (DN 38, Memorandum at Page 11).  Additionally, Stanton again argues Welsh cannot satisfy the second part of the "special relationship" test (DN 38, Memorandum at Page 12).

The Court concludes that Stanton has not satisfied his initial burden of demonstrating the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986).  The deposition testimony of Jailer Stanton and Colonel Woosley, as well as the exhibits appended to Colonel Woosley's deposition, is sufficient to demonstrate that the Detention Center has implemented policies in an effort to comply with State regulations that are intended to separate violent prisoners from non-violent prisoners.  However, the absence of alert notes in the inmate files for both Keesee and Welsh, as well as the absence of any incident reports regarding fighting in Welsh's inmate file, undermines Stanton's assertion that Keesee and Welsh were in fact classified by the Detention Center as violent inmates.[13]  Further, Stanton has not presented any evidence to substantiate their bare assertion that Keesee and Welsh were housed in a cell designated for violent inmates on the night that Welsh alleges the assault occurred.  In sum, the Court concludes that

---

[12]Since Stanton is not asserting qualified immunity as a defense to this claim (DN 38, Memorandum at Page 11), the Court concludes there is no need to address Welsh's ministerial function exception argument (DN 37, Memorandum at Pages 28-31).

[13]Based upon the deposition testimony of Woosley the Court must infer since the inmate files for both Keesee and Welsh, produced through discovery, do not contain alert notes these inmates were not classified as violent inmates by the Detention Center.

Stanton's first argument in support of summary judgment must fail because his assertions in support of the argument are not supported by the evidence in the record.

Additionally, there is no merit to Stanton's contention that Welsh must satisfy a "special relationship" test before he can maintain a negligence claim against Jailer Stanton. Kentucky Courts have held that a "special relationship" must exist between the victim and the public official in order to establish an affirmative legal duty on the public official in the performance of his official duties. City of Florence, Kentucky v. Chipman, 38 S.W.3d 387, 392 (Ky. 2001); Fryman v. Harrison, 896 S.W.2d 908, 910 (Ky. 1995); Ashby v. City of Louisville, 841 S.W.2d 184, 190 (Ky. 1992). A "special relationship" exists if: (1) "the victim was in state custody or was otherwise restrained by the state at the time in question"; and (2) "the violence or other offensive conduct was perpetrated by a state actor." Ashby, 841 S.W.2d at 190. Notably, not one of the Kentucky cases applying this "special relationship" test involves a negligence claim by an inmate victim against a jailer for an assault perpetrated by another inmate, as we have herein.

There is a line of Kentucky cases that recognizes since the jailer has custody, rule and charge of the jail and all persons therein, pursuant to KRS 71.020, the jailer owes a duty to the prisoners to keep them safe and to protect them from unnecessary harm. Rowan County v. Sloas, 201 S.W.3d 469, 479 (Ky. 2006); Hall v. Midwest Bottled Gas Distributors, Inc., 532 S.W.2d 449, 452 (Ky. 1976). Under this line of cases, the Kentucky courts have "imposed a duty on a jailer to exercise reasonable and ordinary care and diligence to prevent unlawful injury to a prisoner placed in his custody." Hall, 532 S.W.2d at 452 (citing Ratliff v. Stanley, 7 S.W.2d 230, 231 (Ky. 1928)). Notably, Kentucky courts have recognized that "a jailer cannot be negligent for failing to prevent what he could not reasonably anticipate." Hall, 532 S.W.2d at 452 (citing Lamb v. Clark, 138

41

S.W.2d 350, 352 (Ky. 1940)).  In sum, since Kentucky courts have held that a jailer's affirmative

legal duty to inmates arises out of KRS 71.020, the two-pronged "special relationship" test does not

apply to Welsh's negligence claim against Jailer Stanton.[14]

In sum, Defendant Stanton has not sustained his burden of demonstrating that he is

entitled to summary judgment as a matter of fact or law on the negligence claim that Welsh has

asserted against him, in his individual capacity.


<u>CONCLUSION</u>

For the foregoing reasons, the Court concludes that Defendants' motion for summary

judgment should be granted in part and denied in part.  The Court will issue a separate order

addressing Defendants' motion for summary judgment.


Copies:        Counsel


--------

[14]The Court observes that the second prong of the "special relationship" test would
effectively vitiate or abrogate the line of Kentucky cases holding that a jailer owes a duty to the
prisoner to keep the prisoner safe and to protect the prisoner from unnecessary harm by other
prisoners.  <u>Hall v. Midwest Bottled Gas Distributors, Inc.</u>, 532 S.W.2d 449, 452 (Ky. 1976);
<u>Lamb v. Clark</u>, 138 S.W.2d 350, 352 (Ky. 1940); <u>Ratliff v. Stanley</u>, 7 S.W.2d 230, 231 (Ky.
1928).